# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 02-2721 & 02-2783

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

JAMAL A. SHEIKH and RAED ALSHEIKH,

*Defendants-Appellants.*

———————

Appeals from the United States District Court
for the Northern District of Indiana, South Bend Division.
No. 01 CR 69—**Robert L. Miller, Jr.**, *Chief Judge.*

———————

ARGUED OCTOBER 20, 2003—DECIDED MAY 6, 2004

———————

Before POSNER, KANNE, and WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge.* A jury convicted defendants Jamal Sheikh and Raed Alsheikh of aiding and abetting food stamp redemption fraud and conspiracy to defraud the United States. At sentencing, the district court enhanced both defendants' sentences by two levels for obstruction of justice, and Sheikh's sentence by three levels for his leadership role in the offense. Defendants appeal these sentence enhancements, but for the reasons stated below, we affirm.

## I. BACKGROUND

Yousef Alsheikh and Jamal Sheikh co-owned the Van Buren Food Store, a small grocery store in South Bend, Indiana from October 1995 to May 1997, when Jamal sold his interest in the store to Yousef.[1] In October 1995, after Jamal submitted an application, the United States Department of Agriculture ("U.S.D.A.") certified the store to accept food stamp coupons as payment for certain eligible grocery items. Grocers participating in the program can redeem food stamps by presenting them, along with a redemption certificate, to a participating bank for deposit. The bank then credits the grocer's account in the amount of the food stamp deposit and, in turn, the United States Federal Reserve credits the bank with the requisite amount of funds.

Over the years, Yousef, Jamal and Yousef's son, Raed Alsheikh, committed food stamp redemption fraud, redeeming food stamps they purchased from customers for less than their value and food stamps they accepted in exchange for ineligible items. In October 2001, a federal indictment charged the three, Yousef, Jamal and Raed, with aiding and abetting food stamp redemption fraud and conspiracy to defraud the United States.[2]

At trial, several witnesses testified regarding the defendants' participation in the fraud. Former employee, Brett Kelly, testified that the store was well-known in the community as a place at which one could readily sell food stamps. Further, on several occasions, he witnessed both Yousef and Jamal purchase food stamps for cash and he also saw Yousef accept food stamps for ineligible items.

---

[1] To avoid confusion, the defendants are hereafter referred to by their first names.

[2] Yousef died before the grand jury returned the indictment.

Kelly also admitted to purchasing food stamps from customers for cash, after Yousef instructed him to do so. Finally, Kelly described a conversation with Raed in which Raed came into the store after an argument with his father and complained, "I can't believe how much money he [Yousef] paid for these food stamps."

Linda Dent, who assists the U.S.D.A. in conducting undercover operations, testified that she visited the Van Buren Market on three occasions and each time she was able to purchase ineligible items with food stamps and/or sell food stamps for cash. On her third visit, a man in his twenties matching Raed's description allowed her to use food stamps to purchase ineligible items and to sell a book of food stamps for cash.

Lisa Nelson, Special Agent with the U.S.D.A., testified that Van Buren's food stamp redemption amount consistently exceeded the amount of food sales, which in her opinion suggested fraud. She further testified that between October 1995 and April 1997, Jamal signed virtually all of the food stamp redemption certificates and thereafter, the redemption certificates were primarily signed by Raed. She also testified that Jamal wrote himself checks totaling $140,000 from the market's bank account.

Anastasia Nerger, an inspector in the Criminal Investigations Division of the U.S.D.A., testified that when she interviewed Jamal after his arrest he admitted that he knew Yousef had purchased food stamps for cash and, despite this knowledge, Jamal continued to redeem the food stamps for at least five or six months.

Daniel Eidem, whose company provided accounting services for Van Buren Market, testified that in multiple months the cash distributed to the store's owners exceeded the store's sales, causing Eidem to question the source of the cash. Soon after Eidem brought these accounting irreg-

ularities to the store owners' attention, Jamal sent Eidem a letter terminating the accounting relationship.

Raed testified that he began working in the store in March or April 1997 due to his father's failing health and, in turn, his father paid him $200 a week. His duties included sorting and stamping food stamps, completing deposit tickets, and depositing food stamps in the bank. Raed denied ever working with Brett Kelly, and he further denied that he ever complained to Kelly about his father paying too much for food stamps. Raed also denied ever purchasing food stamps for cash or accepting food stamps as payment for ineligible items. Likewise, he denied depositing food stamps in the bank knowing that they were illegally obtained.

Jamal testified that he deposited food stamps in the bank, but he never did so knowing the food stamps were obtained illegally. He further denied ever purchasing food stamps for cash. He did admit, however, that one day he witnessed Yousef selling food stamps, which prompted him to take control over the store and the register. Three months later, Jamal sold his interest in the store to Yousef. The government presented evidence that during this period of Jamal's exclusive control over the market, the market redeemed approximately $27,000 more in food stamps than it had in total food sales.

On March 6, 2002, a jury convicted both defendants on all counts. The district court sentenced Jamal to 41 months' imprisonment, attributing to him a loss amount of $284,972.80, and imposing a two-level enhancement for more than minimal planning, a three-level enhancement for his role in the offense, and a two-level enhancement for obstruction of justice. The district court sentenced Raed to 27 months' imprisonment, attributing to him a $300,000 loss amount, and imposing a two-level enhancement for more than minimal planning and a two-level enhancement

for obstruction of justice. Both defendants appeal the obstruction of justice enhancements, and Jamal appeals the enhancement for his leadership role in the offense.

## II. ANALYSIS

### A. Obstruction of Justice Enhancement

Both Jamal and Raed challenge the district court's decision to enhance their respective sentences by two levels for obstruction of justice. We review de novo the adequacy of the district court's obstruction of justice findings and any underlying factual findings for clear error. *United States v. Carrera*, 259 F.3d 818, 831 (7th Cir. 2001).

A court may impose a two-level enhancement under U.S.S.G. § 3C1.1 if "the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the course of the investigation, prosecution, or sentencing of the instant offense of conviction." Perjury is the sort of conduct that may warrant an obstruction of justice enhancement. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993); *see also* U.S.S.G § 3C1.1, cmt. n.4. For enhancement purposes, perjury is defined as giving false testimony under oath "concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory." *Dunnigan*, 507 U.S. at 94.

In enhancing both defendants' sentences, the district court found that both had committed perjury when they denied that they knowingly redeemed food stamps that were illegally obtained. The district court further stated that both defendants' testimony was false, willfully given, and material. Defendants contend that the evidence does not support the district court's perjury findings and that the findings were insufficient because the court failed to delineate specific reasons for discrediting their testimony. We disagree.

Although it is "preferable for a district court to address each element of the alleged perjury in a separate and clear finding," it is sufficient if the district court "makes a finding of an obstruction of . . . justice that encompasses all of the factual predicates for a finding of perjury." *Dunnigan*, 507 U.S. at 95. It is enough for the district court to determine that "the defendant lied to the judge and jury about matters crucial to the question of the defendant's guilt." *United States v. Holman*, 314 F.3d 837, 846 (7th Cir. 2002). Here, the district court has satisfied this standard. It specifically found that each defendant lied about knowingly redeeming illegally obtained food stamps, a matter that is certainly crucial to each defendant's guilt. This finding is amply supported by the record, as multiple witnesses testified to both defendants' involvement in the fraud. Accordingly, we cannot say that the district court erred by imposing the obstruction of justice enhancements.

## B.   Leadership Role Enhancement

Jamal further contends that the district court erred by enhancing his sentence due to his supervisory role in the offense. Sentencing Guideline § 3B1.1(b) provides for a three-level increase in the base offense level "[i]f the defendant was a manager or supervisor . . . and the criminal activity involved five or more participants or was otherwise extensive . . . ." While the district court rejected the government's argument that the food stamp scheme involved five or more participants, it applied the enhancement, reasoning that Jamal was a supervisor of an otherwise extensive scheme. Jamal's argument regarding the enhancement is twofold: first, he argues that the district court erred by deeming him a supervisor and second, he argues that the scheme was not otherwise extensive because it involved fewer than five participants. We consider each argument in turn below, and review for clear error the

district court's findings regarding the defendant's role in the offense. *See United States v. Frazier*, 213 F.3d 409, 417 (7th Cir. 2000). We "will reverse 'only if, after reviewing the entire evidence, we are left with the definite and firm conviction that a mistake has been made.'" *United States v. Schuh*, 289 F.3d 968, 972 (7th Cir. 2002) (quoting *United States v. Carrera*, 259 F.3d 818, 826 (7th Cir. 2001)).

### 1. Supervisor Status

Although the guidelines do not define the term "supervisor," Application Note 4 to U.S.S.G § 3B1.1 indicates that the following factors should be considered in assessing one's supervisory role:

> the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

However, no single factor is essential to the application of the enhancement. *United States v. Granado*, 72 F.3d 1287, 1290 (7th Cir. 1995).

The sole reason offered by the district court for deeming Jamal a supervisor was that he instructed Brett Kelly to engage in food stamp fraud by directing him to "drum up people who were willing to sell their food stamps illegally." Sent. Mem. at 7. This rationale is not apparently supported by the record, as Kelly testified that Jamal never instructed him to purchase food stamps for cash. Kelly Test. at 81. Nonetheless, we "may affirm a sentence adjustment on any ground supported by the record." *Schuh*, 289 F.3d at 973.

Here, there is sufficient evidence in the record supporting the district court's conclusion that Jamal was a supervisor.

Specifically, the record reveals that Jamal made countless deposits of illegally obtained food stamps, obtained a large portion of the proceeds from the fraud as compared to other participants such as Kelly (who admittedly sold food stamps for cash), exclusively ran the store and directed Yousef's activities for a period of time during which the fraud continued, and terminated the services of the bookkeeping firm when it pointed out accounting irregularities. Jamal contends that these tasks are solely consistent with managing the market, as opposed to maintaining the fraud; however, given the nature of the fraud, i.e., that it was intimately tied to the business, many functions inevitably overlap. On these facts, we cannot say that it was clearly erroneous for the district court to deem Jamal a supervisor.

### 2. Otherwise Extensive

We next consider Jamal's argument that the district court erred by applying the enhancement on the basis that the scheme was "otherwise extensive." Jamal contends that the scheme could not qualify as "otherwise extensive," as it involved a small mom-and-pop store and the district court could not specifically identify at least five participants in the scheme. We find the defendant's argument unpersuasive.

The commentary to U.S.S.G § 3B1.1 provides: "In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but used the unknowing services of many outsiders could be considered extensive." The commentary further notes that a participant is one "who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G § 3B1.1, cmt. n.1.

In *United States v. Frost*, 281 F.3d 654, 658 (7th Cir. 2002), this court noted the commentary and found a scheme

"otherwise extensive" despite the fact that only two participants could be named, since many outsiders were also used. This court further noted that the organization involved was extensive and derived significant income from the fraud. *Id.* The district court's logic in this case mirrors the logic of this court in *Frost.* The district court noted that, in addition to the known participants, "the Van Buren Market enterprise used many people (including the food stamp vendors) to make the profit from the scheme; it made a substantial portion of its income through illegal food stamp redemption, and it continued in operation for about two years. It was "otherwise extensive" within the meaning of U.S.S.G § 3B1.1." Sent. Mem. at 9. Because these are precisely the sort of findings affirmed by this court in *Frost*, the district court did not err by deeming the scheme "otherwise extensive."

This conclusion is not, as Jamal suggests, inconsistent with this court's decision in *United States v. Boula*, 932 F.2d 651 (7th Cir. 1991). In *Boula*, this court indicated that the number of people involved in the scheme is central to the "otherwise extensive" inquiry. *Id.* at 654. Jamal argues that because the government did not establish that at least five participants were involved, the scheme cannot qualify as "otherwise extensive." But *Boula* did not say that to qualify as "otherwise extensive" everyone involved in the scheme must be specifically identified or be a participant, i.e., criminally responsible; rather, it focused on all of the people involved in the scheme. Thus, this decision, like *Frost*, which largely focuses on the number of people involved in the operation, counting both participants and outsiders, is in line with *Boula*.

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's imposition of the obstruction of justice and leadership role sentence enhancements.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*