In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 05-3807

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DARYL HARPER,

*Defendant-Appellant.*

_____

Appeal from the United States District Court
for the Northern District of Indiana, Hammond Division.
No. 03 CR 28—**Robert L. Miller, Jr.**, *Chief Judge.*

_____

ARGUED MAY 30, 2006—DECIDED SEPTEMBER 11, 2006

_____


Before POSNER, KANNE, and WOOD, *Circuit Judges.*

KANNE, *Circuit Judge.* In early 2002, steep taxes imposed by various levels of government in Illinois resulted in a levy of 92 cents per pack for consumer purchases of cigarettes in Chicago. At the same time, cigarettes sold in Indiana were taxed at a mere 15.5 cents per pack. An entrepreneur with a car and a willing buyer in Chicago could make a pretty penny, especially if coupons could be used to keep a lid on operating expenses.[1] But arbitrage in this context is called

_____

[1] In a two-part episode of *Seinfeld*, Kramer and Newman devised a similar scheme to capitalize on Michigan's higher deposit for

(continued...)

tobacco diversion, and it is illegal. Daryl Harper appeals his convictions and sentence for taking part in such a scheme. We affirm.

## I. HISTORY

Harper was a manager at a corporate BP Amoco gas station located in Hammond, Indiana, about a mile from the Illinois border. With its proximity to Chicago, the station sold a high volume of cigarettes. The station had 10-12 employees. Harper was responsible for setting work schedules, ordering inventory (including cigarettes), counting money, and balancing the cash register. Each morning, Harper would verify cash and coupon receipts and make the appropriate accounting entries. Harper reported to Vince Gonzalez, who considered Harper to be a stellar manager and consequently spent little time supervising him.

Coupons accepted by the store were mailed weekly to a document processing service in Houston, Texas, by Harper or the assistant manager, Sheri Day. BP had no written policy regarding the acceptance of coupons, but BP did expect them to be honored according to the terms printed on them. Cigarette coupons usually imposed a limit of one coupon per carton and could be redeemed only for a particular brand of cigarette or cigarettes made by a certain manufacturer. No coupon ever allowed a customer to "buy" cigarettes solely with coupons.

---

[1] (...continued)
soda bottles and cans by using a postal truck to transport recyclables gathered in New York for return in Michigan. Alas, the plan was foiled by a fanatical auto mechanic in possession of Jerry's car and JFK's golf clubs. *Seinfeld: The Bottle Deposit: Parts 1 & 2* (NBC television broadcast May 2, 1996).

In the summer of 2001, a customer named Abdelhakim Al-Najjar (known as "Abdul") began to frequent Harper's store and present coupons to purchase cigarettes. Harper told Abdul that he would accept coupons to cover up to half the purchase price. At first, Abdul bought cigarettes only for his own consumption, but he then developed connections in Illinois who wanted to buy cheap cigarettes from Indiana for resale in Illinois. Abdul scoured newspapers for cigarette coupons and began to buy large quantities of cigarettes, paying for them half in coupons, and half in cash. Harper and Abdul soon exchanged cell phone numbers.

Abdul looked for ways to increase his volume. In July 2001, Harper told Abdul that he knew a woman named Carol who worked for a newspaper and sold coupon inserts for 40% of their face value. Harper gave Abdul's number to Carol for her to call him. Abdul bought coupons from Carol and redeemed all of them at Harper's store to buy cigarettes for resale in Illinois. Carol ran out of coupons in August, so Harper referred Abdul to a man named Richard. Richard gave Abdul a steeper discount than Carol did, and the coupons he sold were even precut.

In January 2002, Abdul began redeeming coupons which were supposed to be used to give discounts ($1.50 per pack and $7.50 per carton) for Jade and Eve cigarettes to purchase a different brand, Newport. Around March 2002, Carol and Richard ran low on these coupons, so Abdul asked Harper if he had any other sources. Harper said he would send a man named "T" to Abdul. "T" came to Abdul's place of employment, a liquor store in Rock Island, Illinois. "T" showed Abdul some coupons and sought to negotiate a price, but Abdul thought they looked fake and called Harper. Harper said he would accept the coupons anyway, but Abdul remained reluctant. Harper met with Abdul and pressed him to use "T"'s coupons, saying he would accept any coupon no matter how bad it looked. Abdul said if

Harper was willing to take fakes, Abdul could make more convincing ones himself.

Abdul found a commercial printer who agreed to produce copies of the Jade and Eve coupons. The coupons were printed on bond paper rather than supercalendared newspaper. Abdul showed the fakes to Harper, and Harper agreed to take the coupons, along with $400 and a bottle of cognac. Abdul and Harper agreed Abdul would pay Harper between $100 and $150 per store visit. Abdul passed approximately 12,000 fake strips (each with a stated value of $18) of Jade and Eve coupons. Eventually Abdul was making at least two pickups a day and bought up to 20 cases per trip.

At some point, Harper told Abdul he could only accept coupons which matched the brand purchased. Abdul found a Newport coupon valued at $6 and told Harper he would copy it to continue to buy Newports. Harper agreed, and Abdul passed between 3,000 and 5,000 of these fakes.

Abdul became the biggest customer at Harper's store by a wide margin. Abdul would call ahead to let employees know how many cigarettes he planned to buy. Harper told his cashiers to apply any coupons Abdul provided to any purchases he made. (Harper did not give other customers this benefit.) Because Abdul's purchases were so large, either Harper or Day would oversee the transactions and count the money while cashiers rang up the sales at Harper's direction. Day would group the coupons into $100 increments and enter them into the cash register in batches to save time. Harper sometimes rang up the sale before Abdul arrived and other times after Abdul left with the cigarettes. Abdul was submitting so many coupons they could not fit in the cash register. Although Abdul testified to the contrary, the register tapes showed Abdul at times paid for entire transactions (including the Indiana cigarette tax) with nothing but coupons.

The copied coupons were of poor quality. Some were illegible. Two employees questioned Day about whether it was appropriate to accept them. Day asked Harper, who responded by joking that even if they were counterfeits, they should be accepted.

Abdul's purchases began putting a strain on the inventory of Harper's store, at times depleting it. In March 2002, Harper introduced Abdul to Sharon McKinney, the manager of another BP station nearby. Abdul began buying about $12,000 worth of cigarettes per week from McKinney's store.

The operation grew rapidly to an impressive scale. Prior to the scheme, Harper's store was receiving between $5,000 and $8,000 per month in coupons. Harper reported coupon sales in March 2002 in excess of $70,000. On one day alone, April 1, 2002, Abdul bought 1,710 cartons of cigarettes, presenting over $25,000 in coupons. The next day, the store accepted $34,347.17 in coupons when, by comparison, total non-fuel sales (including cigarettes) were under $57,000. Harper signed off on the accounting reconciliations for these days. Harper's coupon sales for the month of April totaled almost $244,000.

Before the scheme, Harper and his wife were in a financial pinch: behind on the mortgage, owing three years' worth of back taxes, and regularly bouncing checks. Harper's wife had withdrawn from her 401(k) plan. But in the Spring of 2002, Harper's fortunes changed. From March 13, 2002, through the end of May, $24,000 of non-payroll income was deposited into the couple's bank accounts. Of this amount, $19,000 was deposited in April. That month, Harper began to get his financial house in order. He filed his 1999 and 2000 tax returns and paid off $4,900 in back taxes. He caught up on his mortgage, had some roofing work done, made a car loan payment, and bought some furniture. The plan was successful by all measures.

But this activity did not go undiscovered in the Houston processing center, where many types of documents received from BP Amoco stores were sorted and coupons were forwarded to a clearinghouse. A file clerk began to notice huge stacks of identical cigarette coupons coming from Indiana. She notified her superiors, who told her to hold on to the coupons while they investigated. In May 2002, the clearinghouse had rejected 75.7 pounds of fraudulent cigarette coupons purporting to offer discounts for Jade, Eve, or Newport cigarettes. BP's investigation led them to McKinney's and Harper's stores. Harper was indicted on March 6, 2003.

On August 11, 2003, the government mailed a letter to Harper's counsel at the time, Howard Towles. The letter contained a draft analysis and report by a forensic auditor with the Bureau of Alcohol, Tobacco, Firearms and Explosives. The report tentatively concluded that Harper had deposited $23,535 in unexplained cash into his accounts between July 2001 and May 2002. On August 19, Harper filed his 2001 tax return on which Harper reported, in addition to his BP salary, $7,000 in self-employment income as a musician and $9,000 in casino winnings. Five months later, Harper filed his 2002 tax return, reporting another $5,500 in musician income and $1,800 in casino winnings. The non-salary income Harper reported on his 2001 and 2002 tax returns totaled $23,300.

Harper submitted a W-2G form for the $1,800 casino winnings in 2002 but provided no other evidence to the IRS to substantiate the earnings he claimed. A W-2 from the American Federation of Musicians showed Harper earned $213 as a musician in 2001. Harper did not report any income from gambling or self-employment in either 1999 or 2000.

On December 16, 2004, the grand jury returned a 13-count superceding indictment against Harper, Abdul, and

Abdul's wife.[2] Count 1 charged them with conspiracy in violation of 18 U.S.C. § 371. Counts 2 through 13 alleged committing and abetting mail fraud in violation of 18 U.S.C. § 1341 and 18 U.S.C. § 2. On February 15, 2005, a jury found Harper guilty on all counts. On September 9, 2005, the district court held a sentencing hearing.

Applying the 2004 version of the Guidelines, the court determined the offense level—after accounting for the loss amount and Harper's position of trust—was 22. The court then applied sentence Guideline enhancements for role in the offense (U.S.S.G. § 3B1.1(b)) and obstruction of justice (U.S.S.G. § 3C1.1) to increase the offense level to 27. With a criminal history of I, the court calculated a Guidelines range of 70 to 87 months, and then imposed a sentence at the bottom of that range. The court ordered Harper to pay restitution in the amount of $798,383.60 ($500,000 to BP and $298,383.60 to the Illinois Department of Revenue) and a $1,300 mandatory special assessment.

## II. ANALYSIS

Harper seeks to overturn his convictions, arguing it was error for the district court to admit into evidence the letter of August 11, 2003, sent by the government to Harper's previous attorney. Harper claims the letter should have been excluded because it is hearsay, and it does not meet the requirements of Federal Rule of Evidence 403. We review with deference the trial court's evidentiary ruling, and will uphold it if there was no abuse of discretion. *See United States v. White*, 443 F.3d 582, 591 (7th Cir. 2006) (citation and quotation omitted); *United States v. Serrano*, 434 F.3d 1003, 1004 (7th Cir. 2006) (citation omitted).

---

[2] Abdul and his wife pled guilty, and Abdul testified against Harper. Abdul was sentenced to 21 months' imprisonment and his wife received two years' probation.

"'Hearsay' is a statement, other than one made by the declarant while testifying . . . offered in evidence to prove the truth of the matter asserted." Fed. R. Evid. 801(c). To constitute hearsay, the August 11 letter must have been offered to prove Harper had $23,535 in unreported income. It was not. The letter contained the government's preliminary estimation of Harper's unexplained income. At trial a revised report was used, alleging a greater amount of unexplained income. "The inquiry is whether evidence, while not introduced for the truth of the matter asserted, nonetheless is probative of some element the government must prove." *Serrano*, 434 F.3d at 1005 n.2. Sudden, unexplained cash receipts are relevant to prove a conspiracy in which pecuniary gain is the usual motive. *See United States v. Towers*, 775 F.2d 184, 187-88 (7th Cir. 1985) (citing *United States v. Chagra*, 669 F.2d 241, 256 (5th Cir. 1982), *overruled on other grounds by Garrett v. United States*, 471 U.S. 773 (1985).

According to the government, after depositing $23,535 of fraudulently obtained cash into his bank accounts, Harper had some income explaining to do, and did so by filing two false income tax returns. Harper was already running a couple years late in that regard, but a mere eight days after the letter was sent, Harper filed one of his overdue tax returns, which reported income from new, unverifiable sources—gambling and self-employment as a musician. A few months later, Harper filed his second overdue tax return reporting income from the same sources. The sum of Harper's newfound income on these returns was almost identical to the amount in the letter. The letter was properly admitted to prove its effect on Harper—that its receipt spurred him to cover his tracks— and was strong circumstantial evidence of his guilty conscience. *See* Fed. R. Evid. 801(c), 404(b); *United States v. Levine*, 5 F.3d 1100, 1107 (7th Cir. 1993); *United States v. Norwood*, 798 F.2d 1094, 1097 (7th Cir. 1986).

Nevertheless, Harper denies receiving the letter. Harper points out that because the government addressed the letter to Harper's attorney, it is necessary to infer Harper's attorney gave the letter to Harper. Harper argues the admission of the letter, and allowing that inference to be made, violates Rule 403, which provides that relevant evidence should be excluded if its prejudicial effect substantially outweighs its probative value.

Lawyers are expected to confer with their clients, *see, e.g.*, Ill. Rules of Prof'l Conduct R. 1.4(a), and it is not unreasonable to infer they do so. Harper testified he did not receive the letter and points out that this lawyer's license was suspended shortly thereafter. But Harper's argument points to circumstances which merely tend to weaken the inference, not to negate it. The prejudicial effects Harper alleges to have suffered, such as taking the stand in his own defense, involve strategic decisions which are not within the realm of Rule 403. The only prejudicial effect which would have been apparent to the factfinder was the letter's strong probative value—the prejudice was not unfair and did not outweigh the probative value—as such there is no basis for exclusion under Rule 403. *See Cook v. Hoppin*, 783 F.2d 684, 689 (7th Cir. 1986) (citations omitted).

Harper has not shown that the district court's admission of the letter into evidence was not "within the range of options from which one could expect a reasonable trial judge to select." *McGeshick v. Choucair*, 9 F.3d 1229, 1236 (7th Cir. 1993) (citation and quotations omitted). Therefore, we conclude the district court did not abuse its discretion, and Harper's convictions should be affirmed.

Harper also challenges his sentence, claiming the three-level sentencing enhancement under U.S.S.G. § 3B1.1(b) for his role in the conspiracy was erroneously applied. We review the district court's findings regarding role in the offense for clear error. *United States v. Sheikh*, 367 F.3d

683, 687 (7th Cir. 2004) (citation omitted). We will not reverse unless, after reviewing all evidence, we are "left with the definite and firm conviction that a mistake has been committed." *United States v. Carrera*, 259 F.3d 818, 826 (7th Cir. 2001) (citations and quotations omitted). Section 3B1.1(b) states, "If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by 3 levels." As Harper sees it, he was not a manager or supervisor and there were fewer than five participants.

Harper argues his role was not as a supervisor under § 3B1.1 but was akin to that of a broker because he did not exercise decision-making authority over any participants. To distinguish among aggravating roles, the Guidelines do not draw bright lines; rather, Application Note 4 to U.S.S.G. § 3B1.1 suggests following a functional approach by evaluating factors relevant to the circumstances. *See Sheikh*, 367 F.3d at 687-88. Management functions of a business may overlap with the management of a criminal enterprise where the fraud is intimately tied to the business. *Id.* at 688. In this case, the defining feature of the conspiracy was Harper's misuse of his authority as a manager of a business to perpetuate the fraud. Therefore, the district court's finding that Harper was a manager for § 3B1.1 purposes, although its reasoning focused on Harper's management of store employees, was not clearly erroneous.

As for Harper's claim that there were not five participants in the conspiracy, Application Note 1 to § 3B1.1 defines a "participant" to be "a person who is criminally responsible for the commission of the offense, but need not have been convicted." Harper admits Abdul, Abdul's wife, and Harper himself were participants but argues that is the end of it. The district court found two other individuals were criminally involved, namely Said Kaisi and "T".

Kaisi was named in the original indictment and pled guilty and admitted that his role in the conspiracy was to buy cigarettes from Abdul for resale in Chicago. Harper argues that Kaisi does not count because the original indictment alleged the conspiracy operated during a different time frame (July 1, 2001, through July 14, 2002) than the evidence adduced at Harper's trial under the superceding indictment which alleged a shorter time frame (January 26, 2002, through June 14, 2002). The superceding indictment did not allege a wholly different time frame than the original. The government merely narrowed the time frame, which did not have the effect of excluding Kaisi from the conspiracy. Harper makes no attempt to explain how this could result in a clearly erroneous finding that Kaisi was a participant, because it was not.

Harper argues "T" was not criminally responsible, pointing out that he testified he did not know an individual by the name of "T". The district court found there was enough evidence to find that there existed a fifth participant, referred to by Abdul as "T", regardless of the actual name. Participants need not be identified by actual name in order for a supervisory enhancement to apply. *See United States v. Mansoori*, 304 F.3d 635, 668-69 (7th Cir. 2002). Abdul testified that "T"—at Harper's direction— presented Abdul with a sample counterfeit coupon. After Abdul told "T" he could not use the coupons because they looked fake, "T" offered to reduce the price. The district court determined it was more likely than not that "T" was criminally responsible for the conspiracy, and Harper's self-serving testimony to the contrary does not cause this finding to be clearly erroneous. The district court stopped counting the criminal participants when it reached five, although it could easily have gone higher.

Harper does not otherwise challenge the Guidelines calculations, or the reasonableness of his sentence at the bottom of that range. Harper's sentence is presumptively

reasonable, *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005), and it should be affirmed.

### III.  CONCLUSION

For the foregoing reasons, Harper's convictions and sentence are AFFIRMED.

A true Copy:

       Teste:

                _____
                *Clerk of the United States Court of*
                   *Appeals for the Seventh Circuit*