NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued April 10, 2008
Decided June 10, 2008

**Before**

JOEL M. FLAUM, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

TERENCE T. EVANS, Circuit Judge

No. 07-3714

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee,* | Court for the Northern District of |
| | Illinois, Eastern Division. |
| *v.* | |
| | No. 05 CR 1003 |
| MARK J. HELFAND, | |
| *Defendant-Appellant.* | Samuel Der-Yeghiayan, *Judge.* |

**O R D E R**

In 1999, attorney Mark Helfand got mixed up in a real estate flipping scheme with The Jackson Four: Maria, Dawn, Jackie, and James. Helfand, along with three of the Jacksons, was indicted for defrauding Flagstar Bank, 18 U.S.C. § 1344, which bought twelve mortgages on properties flipped by the group. A jury found Helfand guilty on only one of the twelve counts of bank fraud charged in the indictment. He now appeals his conviction, arguing that the government failed to present sufficient evidence of his intent to defraud Flagstar.

The Jacksons pleaded guilty to the charges in the indictment and testified at Helfand's trial. Dawn explained that she first met Helfand when she was purchasing a property about to go into foreclosure--she retained Helfand to represent her at the closing based on her mortgage broker's recommendation. Soon Helfand became more involved in the Jacksons' business ventures. The Jacksons explained that they would find distressed, low-cost properties--generally priced around $30,000--but because they had bad credit, they looked to Helfand instead of a bank to front the money for the purchase. Helfand agreed to loan the money to the Jacksons for a $5,000 fee, required payment quickly--usually within 30 days--and charged $1,000 for every week payment was late.

These terms made prompt payment important, so the Jacksons would line up buyers before they actually acquired the properties themselves. The Jacksons enticed the buyers by explaining that no down payment was required, representing that the Jacksons would help secure financing on the buyers' behalf, and promising to renovate the properties with the loan proceeds. After purchasing the properties with Helfand's help, the Jacksons, two of whom were appraisers, then valued the properties as if they had already been renovated and set the resale price at falsely inflated appraisal values. They filled out loan applications with Flagstar Bank on behalf of the buyers, overstating the buyers' assets and income, and attached doctored bank account and employment verification letters in support of their misrepresentations. The Jacksons testified, though, that Helfand was not involved with the false appraisals or loan applications.

Once Flagstar approved the loan applications, Helfand stepped in again, acting as the closing attorney for the Jacksons. The closings came quickly on the heels of the Jacksons' initial purchases of the properties--for the count of conviction, the Jacksons purchased the property for $30,000, and eight days later Helfand conducted a closing to sell the property for $85,000. Although all of the loans required the buyers to pay a down payment, none did. For most of the indicted transactions, Helfand paid the down payment and other closing costs on behalf of the buyers and then directed the title company that performed the closing to reimburse him those funds. Once Flagstar disbursed the funds, Helfand also directed the closing agent to pay him the amount he loaned the Jacksons for the initial purchase of the property plus the $5,000 loan fee. The remaining funds (after all the closing costs were paid) went to the Jacksons. The Jacksons never renovated the properties, and the buyers were left with run-down, often uninhabitable homes. Soon, the buyers were unable to keep up with their mortgage payments and the loans quickly fell into foreclosure.

Although Helfand was usually uninvolved with the procurement of the loans, the government presented evidence that he helped secure one. Lisa McGill, Maria Jackson's hairdresser, purchased one of the properties, but before Flagstar would disburse the mortgage funds, it required proof that she could pay the down payment. McGill, however, did not have the money to make the down payment. In order to satisfy Flagstar, Helfand withdrew $27,000 from a personal account in the form of a cashier's check payable to McGill. He then opened a bank account (a lawyer's trust account) in McGill's name and deposited the cashier's check into that account. In order to do so, the cashier's check was endorsed to Helfand purportedly by McGill. But McGill testified that her signature on the back of the check, which authorized payment to Helfand, was a forgery, and stated she had no knowledge that this account was set up. Helfand's secretary, on the other hand, testified that the handwriting on the back of that cashier's check was Helfand's and that his signature appeared accurate. After the account was created, the bank generated a letter verifying that McGill had $27,000 in the account. That letter was faxed to the mortgage broker from Helfand's office, and from there, faxed to Flagstar. Just a day after the account was opened and the verification letter was faxed, McGill's account was closed and the $27,000 was deposited into an account controlled by Helfand. After receiving the faxed letter, Flagstar disbursed the funds.

After the government rested, Helfand moved for a judgment of acquittal, arguing that although the Jacksons perpetrated a massive fraud, he unwittingly participated in the scheme. He maintained that there was nothing fraudulent about his paying the down payments on behalf of the buyers because he did so openly, and the closing agent--and by extension Flagstar--had to be aware of this fact. He also maintained that because he opened a lawyer trust account on behalf of McGill, holding the $27,000 in a representative capacity, his actions were not fraudulent. The district court denied this motion, and the jury found Helfand guilty on only the count involving the McGill transaction.

At sentencing the government argued that the district court should base Helfand's sentence on the loss generated by all of the indicted counts, contending that the acquitted counts could be considered relevant conduct. The district court rejected this argument, finding insufficient evidence "that the losses in the acquitted counts are attributable to the Defendant[.]" Instead the court calculated the loss amount to be $21,000 by subtracting the $38,000 Flagstar recovered after selling the McGill property from the $59,000 principal on McGill's mortgage. The district court then sentenced

Helfand to a below-guidelines sentence of five months imprisonment, but tacked on an additional five months of home confinement with electronic monitoring. Finally, the district court ordered that Helfand pay $16,000 in restitution to Flagstar, crediting him $5,000 for payment he had made to Flagstar as part of a settlement of a civil suit with the bank.

On appeal Helfand first argues that there was insufficient evidence to establish that he had the requisite intent to defraud Flagstar. Section 1344, which proscribes any scheme to defraud a bank by means of false pretenses, "requires the showing of an intent to deceive a bank in order to obtain from it money or other property." *United States v. Lane*, 323 F.3d 568, 583 (7th Cir. 2003). Defendants who argue that the government presented insufficient evidence to support a jury's verdict face "a steep uphill battle." *United States v. Jaffe*, 387 F.3d 677, 680 (7th Cir. 2004); *United States v. Graham*, 315 F.3d 777, 781 (7th Cir. 2003). It's not enough for a defendant to offer alternative, innocent explanations for his conduct. *United States v. Humphreys*, 468 F.3d 1051, 1054 (7th Cir. 2006); *United States v. Romero*, 57 F.3d 565, 570 (7th Cir. 1995). Instead, the defendant must show that, even when viewing the evidence in the light most favorable to the government, no rational jury could have found him guilty beyond a reasonable doubt. *United States v. Bailey*, 510 F.3d 726, 733 (7th Cir. 2007).

Helfand urges us to examine the McGill transaction within the context of the eleven other transactions included in the indictment. He argues that in all twelve transactions, the closing agent, and by extension Flagstar, knew that the buyers were not paying the down payment. The closing agent--who testified that she represented the lender's interest in the transaction--accepted Helfand's checks to pay the down payment and, in two transactions, directly paid the down payment herself, refunding her company once the transaction closed. According to Helfand, everyone knew that the buyers were not supplying the down payments, and the bank letter he procured evidencing McGill's ability to pay the down payment was not intended to defraud Flagstar, but rather generated to fulfill one of its *pro forma* requests.

While this is a plausible interpretation of the evidence, it is not the only interpretation that the jury was permitted to make; a reasonable jury could also conclude that Helfand deceived Flagstar to ensure that McGill could get a loan to buy the home. The government presented circumstantial evidence that Helfand knew of the fraudulent flipping scheme and wished it to succeed. Ensuring McGill secured a mortgage also ensured that Helfand could recoup the money he had initially invested to

purchase the property plus his $5,000 loan fee.  And a jury was certainly entitled to infer, from the drastic and quick appreciation of the property's value, that Helfand knew a fraud was afoot.  Discounting the down payment and closing costs from the purchase price, the property's value doubled ($30,000 to $60,000) in just eight days-- a suspiciously high return even in a hot real-estate market.  And it was only with Helfand's help that the scheme was successful.  Helfand used his own funds to make it look like McGill had $27,000 for the down payment, a lie that overstated her assets and exposed the bank to a higher risk of nonpayment than it might have otherwise assumed.  The fact that he opened a lawyer trust account and purported to hold McGill's money in a representative capacity is inconsequential.  McGill never had the money, and by opening an account and sending Flagstar a letter claiming that she did, Helfand provided false information to the bank.  The provision of such falsified information is sufficient to prove Helfand's intent to defraud Flagstar.  *See United States v. Frost*, 281 F.3d 654, 656 (7th Cir. 2002); *United States v. Moede*, 48 F.3d 238, 241-42 (7th Cir. 1995).

Next, Helfand challenges the district court's finding that the fraud amounted to a $21,000 loss, which formed the basis of the restitution order and a 4-level upward adjustment to his offense level under the guidelines.  Helfand points out that Flagstar purchased the McGill property for the full amount then due on the mortgage at the sheriff's foreclosure sale instead of letting it go to the next highest bidder (he does not disclose what that bid would have been).  Thus, he contends that any subsequent loss Flagstar suffered was its own doing and his fraud caused no loss.

But a fraud victim's effort to mitigate its losses does not lessen the wrongdoer's liability.  *United States v. Vitek Supply Corp.*, 144 F.3d 476, 488-89 (7th Cir. 1998) (holding that costs of measures to rectify harm caused by defendant properly considered when calculating fraud loss).  Rather, the touchstone of a fraud loss calculation is the pecuniary harm that was intended or resulted from the offense.  U.S.S.G. § 2B1.1 cmt. n.3(A); *United States v. Radziszewski*, 474 F.3d 480, 486 (7th Cir. 2007).  Flagstar lost money because of Helfand's participation in the Jacksons' fraud.  His misrepresentations induced Flagstar to fund a $59,000 mortgage to McGill against a pledged collateral that ended up being worth $38,000, far less than the $85,000 represented on the loan application.  The district court properly calculated the fraud loss as the amount of the loan, deducting the amount Flagstar recovered from selling the property.  U.S.S.G. § 2B1.1 cmt. n.3(E)(ii); *Lane*, 323 F.3d at 590 (fixing intended loss

at amount of loan less value of collateral pledged to secure loan); *United States v. Downs*, 123 F.3d 637, 643 (7th Cir. 1997).

Helfand also raises a separate challenge to the court's restitution order. When calculating the restitution amount, the district court credited Helfand $5,000 for settlement payments he made to Flagstar in a separate civil suit. In that suit Flagstar alleged that it incurred losses on at least 42 different mortgages, including the McGill transaction, and Helfand settled the case for $238,000, which, according to the terms of the agreement, represented his "gross earnings . . . in connection with the transactions at issue." Based on this settlement figure, Helfand paid back, on average, a little over $5,000 per transaction. Using this settlement amount and trial evidence demonstrating that Helfand made $5,000 in fees when he fronted money to the Jacksons for the initial purchase of the properties, the district court concluded that $5,000 of the $238,000 settlement could be attributed to the McGill transaction. Helfand now suggests that he should be credited the whole amount of the settlement and therefore owes nothing in restitution.

This argument misses the mark. A restitution award must credit payments the defendant makes to the victim for the losses stemming from his offense, 18 U.S.C. § 3664(j)(2)(A); *United States v. Swanson*, 394 F.3d 520, 528 (7th Cir. 2005), but not for unrelated losses. Here, the restitution amount is based on only the McGill transaction, so Helfand should not receive credit for payments he made to Flagstar for other transactions. While it's possible that more of the $238,000 settlement could be apportioned to the McGill transaction, Helfand never offered evidence that it did, and we cannot say that the district court's approximation was an abuse of discretion. *United States v. Sensmeier*, 361 F.3d 982, 988 (7th Cir. 2004).

Accordingly, the judgment of the district court is **AFFIRMED**.