In the

# United States Court of Appeals

### For the Seventh Circuit

No. 11-2248

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

NAEIL HUSSEIN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 CR 482-1—**Rebecca R. Pallmeyer**, *Judge.*

ARGUED OCTOBER 5, 2011—DECIDED DECEMBER 13, 2011

Before EASTERBROOK, *Chief Judge*, and MANION and ROVNER, *Circuit Judges.*

MANION, *Circuit Judge.* Naeil Hussein and his girlfriend, Lisa Bazian, operated what appeared to be convenience stores on the south side of Chicago. In fact they were little more than fronts where the couple rang up phony sales for food-stamp recipients looking to exchange their benefits for discounted amounts of cash. When federal investigators discovered the fraudulent scheme at one location, the pair simply obtained government authorization to accept food

stamps at a different address where they continued their operation. Through a surrogate Hussein opened a third store and even attempted to qualify an ineligible restaurant. Hussein eventually pleaded guilty to eight counts of wire fraud, 18 U.S.C. § 1343, and was sentenced to a total of 60 months' imprisonment and ordered to pay almost $1.7 million in restitution. On appeal he challenges the amount of loss and a 4-level leader-ship adjustment used in calculating his offense level, as well as the reasonableness of his prison term. We affirm the judgment.

I.

Hussein and Bazian launched their scam at The Spot Food Mart ("Spot Mart"), a store that Bazian had acquired in the Englewood neighborhood of Chicago. In 2003 Bazian applied to the United States Department of Agriculture on behalf of Spot Mart to participate in the federal Food Stamp Program. The program supplies low-income persons with debit cards, known in Illinois as LINK cards, that can be used to purchase food.[1] The USDA approved Spot Mart's application but not before making Bazian send proof that she was not connected to the store's prior owner, who had accepted food stamps but later was sanctioned for abusing the program. Spot Mart brought in a little more than $2,000 in benefits in June 2004, its first month with a

---

[1] Congress has since renamed the program the Supplemental Nutrition Assistance Program. *See* Food, Conservation, and Energy Act of 2008, Pub. L. No. 110-246, § 4001(b), 122 Stat. 1651, 1853 (2008).

LINK scanner, but by October 2005, the monthly total had ballooned more than 60-fold to nearly $130,000. Near the end of that month, a USDA informant twice used a LINK card at Spot Mart to trade food-stamp benefits for lesser amounts of cash. The description the informant gave of the clerk who processed one of those fraudulent transactions matched Hussein. The next week federal agents executed a search warrant at the store. During that search a USDA agent interviewed Hussein, the store manager, who denied trading cash for food-stamp benefits. The USDA disqualified Bazian from the program but took no action against Hussein.

About three months later Hussein applied to the Food Stamp Program on behalf of a second Englewood store, Halsted Food Mart ("Halsted"). Despite his role as manager at Spot Mart, the USDA approved the application. Again using an informant, the USDA developed evidence that the new location, like the old, was nothing more than a front for swapping benefits for cash. Once more authorization to participate in the program was revoked, but not before the Halsted scam had run for more than two years and at its height brought in over $100,000 a month in benefits.

In addition, shortly before federal agents executed a search warrant at Halsted, one of Hussein and Bazian's employees, Dwight Fleming, applied to the program on behalf of a third Englewood location, Route 69 Palace. Fleming represented on the application that he owned Route 69 but later admitted that Hussein, the true owner, had paid him to claim ownership. The USDA developed

evidence that Hussein and Bazian were trading cash for benefits at Route 69, though not before the pair had run their scam there for more than seven months. Hussein also applied to the Food Stamp Program on behalf of a fourth Englewood business, Spot Chicken Fish & Pizza ("Spot Chicken"), but the USDA rejected that application, presumably because benefits generally cannot be used at restaurants. *See* 7 C.F.R. § 278.1(b)(1)(iv). Still, for reasons that are unclear from the record, food-stamp recipients were able to trade their benefits for cash at Spot Chicken. In total, Hussein and Bazian ran their fraud for more than four years.

According to bank records for Spot Mart and Halsted, the two locations brought in a total of $1,859,939 in LINK benefits. The government calculated that, during roughly that same time period, Hussein and Bazian wrote checks for food inventory totaling $164,660 from the accounts where LINK funds were deposited. Route 69 took in $128,198 in LINK benefits, and checks for food totaling $49,043 were drawn on the account where those benefits were deposited during the time the store had a LINK scanner. According to the government, Spot Chicken brought in another $228,497 in LINK receipts despite having no authorization to accept LINK cards.

Following Hussein's guilty plea, the probation officer recommended in the presentence report that the district court assess the loss from the fraud as $1,695,250 and apply a 16-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(I). The probation officer reached this figure by subtracting the checks Hussein and Bazian wrote for food inventory at Spot Mart

and Halsted from the amount of LINK redemptions at those locations. The probation officer's total inexplicably ignores the LINK receipts at Route 69 and Spot Chicken, but still Hussein objected that the loss calculation was too high. His lawyer contended, without explanation, that inventory costs for food exceeded those listed in the presentence report and argued that the government's formula failed to account for "legitimate profit" on food sales. But Hussein did not present evidence of additional inventory costs, nor did he attempt to quantify the authorized food items sold at Spot Mart and Halsted. Instead, counsel simply asserted without explanation that the government's loss was about $900,000, enough to yield a 14-level increase but below the $1 million threshold for the proposed 16-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(H). The government responded that the probation officer's calculation was, if anything, understated because it did not incorporate relevant conduct at Route 69 or Spot Chicken and also assumed that every food purchase at Spot Mart and Halsted was made with LINK benefits rather than cash. And even focusing on just the LINK sales, the government argued, Hussein was not entitled to an adjustment for gross profit because he and Bazian tried to mask their scheme by requiring persons selling their benefits to buy a small food item when presenting their LINK cards. The district court overruled Hussein's objection and adopted the probation officer's calculation. The court offered its "layperson's understanding" that grocery stores operate at a "very low profit margin" and reasoned that any adjustment to account for gross profit would be too minimal to alter the guidelines calculation.

The parties also disagreed at sentencing about what adjustment to apply for Hussein's role in the offense. The probation officer recommended a 4-level increase, *see* U.S.S.G. § 3B1.1(a), after concluding that Hussein had been "an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." The probation officer reasoned that the scheme "involved at least three participants and was otherwise extensive (in that benefits were exchanged for cash with several other individuals/participants)." Hussein urged the district court to apply instead a 2-level adjustment. *Id.* § 3B1.1(c). Defense counsel said nothing about the number of people involved in the fraud and contended that the scheme had been a "basic fraud" that was not extensive. The prosecutor countered that the number of persons involved could not possibly have been less than five because, in the government's view, every LINK cardholder who illegally traded benefits for cash was a "participant" in the scheme. The prosecutor also asserted that the scheme had been extensive. The district court adopted the probation officer's recommendation. The judge counted as participants Hussein, Bazian, and Fleming but did not comment on the government's contention that the sellers of LINK benefits also were participants. Rather, while not officially labeling the many LINK traders as participants, the court easily defined the scheme as extensive. She found it significant that Hussein had run his scam from multiple locations, supervised employees at his stores, and traded cash for benefits with "dozens, probably hundreds, of customers."

Based on a total offense level of 24 and a criminal history category of I, Hussein faced a guidelines imprisonment range of 51 to 63 months. The government argued for a sentence within the guidelines. Pointing to the dearth of grocery stores in Englewood, the prosecutor criticized Hussein for offering the community nothing more than "pop, chips, candy, and cash" and speculated that some of his clients used the cash they got from him to buy drugs. Hussein's lawyer countered that the government had presented no evidence connecting Hussein to the drug trade and could not hold him responsible for drug use in Englewood. Counsel also highlighted Hussein's limited criminal record, his family ties, and his history of seizures stemming from a medical condition that had required brain surgery.

The district court sentenced Hussein to 60 months. The judge emphasized Hussein's decision to continue the fraud after the search at Spot Mart and his bilking of a taxpayer-funded program. The court also found significant the breadth of the scheme and the options Hussein had available to him as a property owner and businessman. Echoing the government's theme about the lack of grocery stores in Englewood, the court commented:

> [T]hese individuals who are entitled to be nourished just like I am really don't have much of an option here. I recognize that that's not directly relevant to the fraud that's been charged, but . . . the fraud relies on a program that is made available to enable poor people to eat. And in that sense, I think the fact that Mr. Hussein was essentially providing them with nothing but chips and pop is relevant.

The judge did not embrace the prosecutor's speculation about drug use, however, and clarified the court's understanding that the prosecutor's remarks had been "aimed at the harm that this particular crime imposes on the community as opposed to a suggestion about Mr. Hussein's knowing culpability." The court acknowledged Hussein's medical condition but concluded that he would receive adequate treatment in prison and made no mention of his other arguments in mitigation.

## II.

On appeal Hussein first argues that the district court erred in imposing the 16-level increase under § 2B1.1(b)(1)(I) for a loss of more than $1 million because, Hussein insists, the court ignored "legitimate profit margin" in assessing what portion of the food-stamp benefits were obtained fraudulently. Hussein repeats his assertion made in the district court, again without citing to any evidence in the record, that the actual loss was about $900,000, which would have limited the increase to 14 levels under subsection (b)(1)(H).

The proper method to calculate loss from food-stamp fraud is to subtract legitimate food-stamp sales from total food-stamp redemptions. *United States v. Ali*, 619 F.3d 713, 721 (7th Cir. 2010); *United States v. Hassan*, 211 F.3d 380, 383 (7th Cir. 2000); *United States v. Barnes*, 117 F.3d 328, 335 (7th Cir. 1997). When precise evidence about legitimate sales is unavailable, the sentencing court may rely on the estimate of a store's monthly eligible food sales given to the USDA during the application process. *See United States v. Haddad*,

462 F.3d 783, 794 (7th Cir. 2006); *United States v. Alburay*, 415 F.3d 782, 790 (7th Cir. 2005).

Hussein is correct to the extent he contends that the district court's loss analysis was incomplete. Merchants mark up the price of the inventory they sell, and by subtracting only the cost of the food from the LINK receipts, the court made no attempt to accurately account for gross profit on legitimate sales. But for several reasons this misstep had no practical effect on the choice between subsections (b)(1)(I) and (b)(1)(H). First, the district court's loss calculation ignores more than $350,000 in LINK receipts at Route 69 and Spot Chicken, even though the fraud at those two locations was relevant conduct because it was "part of the same course of conduct or common scheme or plan as the offense of conviction." *See* U.S.S.G. § 1B1.3(a)(2); *United States v. Barnhart*, 599 F.3d 737, 748 (7th Cir. 2010); *United States v. Swanson*, 483 F.3d 509, 514 (7th Cir. 2007). In fact, every cent of the $228,497 in LINK receipts at Spot Chicken was necessarily fraudulent because that establishment had been denied authorization to accept food stamps. Second, the district court's calculation assumes, to Hussein's benefit, that legitimate customers used LINK cards to buy all of the food inventory at Spot Mart and Halsted, though bank records show that both stores received a small portion of their proceeds in cash. Third, just as the district court recognized, any adjustment for gross profit on the meager food inventory legitimately sold at these locations would have been too minimal to affect the guidelines calculation. In their applications to the USDA, Hussein and Bazian had estimated $15,000 in monthly sales on food items at Spot

Mart and $3,900 in monthly food sales at Halsted. Spot Mart accepted LINK benefits for 18 months, and Halsted accepted LINK benefits for 27 months, so the alternative method approved in *Haddad* and *Alburay* would yield estimated legitimate sales totaling $375,300. Subtracting this amount from the LINK receipts at the two locations equals a loss of $1,484,639, well over the $1 million minimum for a 16-level increase. And as far as we can tell from the record, once the relevant conduct from Route 69 and Spot Chicken is added to that figure, the only conclusion to be drawn is that the loss amount calculated by the district court is *understated*, not overstated.[2]

---

[2] In a snippet of his discussion about the guidelines loss, Hussein asserts that the district court's incomplete methodology also adversely influenced its calculation of restitution. The court used the probation officer's loss calculation to impose a restitution award of $1,695,250. The amount of restitution does not always correspond to guidelines loss because the rules for calculating each differ, *see United States v. Middlebrook*, 553 F.3d 572, 579 (7th Cir. 2009); *United States v. Caputo*, 517 F.3d 935, 943 (7th Cir. 2008), but at sentencing Hussein made only a pro forma objection to the probation officer's calculation of restitution and arguably waived even that objection by declining the court's invitation to vet the issue at a hearing for that purpose. *See United States v. Roberts*, 534 F.3d 560, 571-72 (7th Cir. 2008); *United States v. White*, 993 F.2d 147, 148-49 (7th Cir. 1993). And now on appeal Hussein has omitted from his opening brief any analysis of the restitution award; his statement of the issues does not even mention restitution. We have admonished that a party

(continued...)

Hussein next contends that the district court erroneously assessed a 4-level increase under § 3B1.1(a). Hussein does not dispute that he was an organizer or leader of the scam. But he insists that the court should have added only 2 levels under § 3B1.1(c) because, he maintains, the scheme was not "otherwise extensive" and did not involve five or more participants. For purposes of § 3B1.1, a participant must be "criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1 cmt. n.1. The government insists, as it did at sentencing, that anyone who sold food-stamp benefits to Hussein or Bazian was actively involved in their scam and thus a "participant" for purposes of § 3B1.1.

This reasoning seems sensible, though the government could have strengthened its point by introducing evidence—which we presume it possesses—that many of the LINK cardholders who sold their benefits to Hussein and Bazian did so repeatedly. Yet simply accepting

---

(...continued)

waives or abandons a potential appellate claim by not developing an argument in his brief. *Montgomery v. Am. Airlines, Inc.*, 626 F.3d 382, 392 n.2 (7th Cir. 2010); *United States v. Elst*, 579 F.3d 740, 747 (7th Cir. 2009). It is not enough " 'to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.' " *Bank of Am., N.A. v. Veluchamy*, 643 F.3d 185, 190 (7th Cir. 2011) (quoting *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990)). Hussein has failed to brief, and thus abandoned, any claim of error concerning restitution.

fraud proceeds, stolen goods, or other contraband does not make recipients participants in the underlying scheme that produced the ill-gotten benefits when they are simply customers and not part of the operation. *See United States v. Barrie*, 267 F.3d 220, 223 (3d Cir. 2001); *United States v. Egge,* 223 F.3d 1128, 1133 (9th Cir. 2000); *United States v. Melendez*, 41 F.3d 797, 800 (2d Cir. 1994). What matters is whether the recipient played an active role in the scheme. *See United States v. Butler*, 646 F.3d 1038, 1041-42 (8th Cir. 2011) (counting as participants recipients of fraudulent checks who cashed checks and split proceeds with other schemers); *United States v. Zichettello*, 208 F.3d 72, 108 (2d Cir. 2000) (counting as participant the recipient of an illegally discounted car where evidence permitted inference that recipient was criminally involved in broader scheme). We decline to decide on which side of this line the food-stamp sellers in this case fall because we agree with the district court that the fraud scheme was "otherwise extensive," and thus the number of participants does not matter. An offense can be otherwise extensive for purposes of § 3B1.1 even if fewer than five people participated. *See* U.S.S.G. § 3B1.1 cmt. n.3; *United States v. Sheikh*, 367 F.3d 683, 688-89 (7th Cir. 2004); *United States v. Frost*, 281 F.3d 654, 658 (7th Cir. 2002). And a scheme such as this one can be otherwise extensive when the defendant made a substantial portion of his income (close to two million dollars) through fraudulent redemptions, continued in operation for an extended period, and "used many people (including the food stamp vendors) to make the profit from the scheme*." Sheikh*, 367 F.3d at 688-89 (food-stamp fraud); *see also United*

*States v. Diekemper*, 604 F.3d 345, 354 (7th Cir. 2010) (bank-ruptcy fraud); *United States v. Dong Jin Chen*, 497 F.3d 718, 722 (7th Cir. 2007) (extortion and tax fraud). Similar factors were present here; the district court noted that Hussein ran his scam from multiple locations, traded cash for benefits with "probably hundreds" of customers, and supervised employees at his stores. Thus the court did not clearly err in finding the scheme otherwise extensive.[3]

---

[3] The facts of this case cast an unfortunate shadow on the government's ability to ferret out fraudulent applications from merchants seeking approval to accept food-stamp benefits, and an even longer shadow on the government's willingness to combat fraud aggressively after its discovery. Presently there are over 45 million people receiving food stamps—an increase of almost 70% since October 2007. *See* Supplemental Nutrition Assistance Program Monthly Data, *available at* http://www.fns.usda.gov/pd/34SNAPmonthly.htm (last visited Nov. 10, 2011). For fiscal year 2010, the program cost over $68 billion. *See* Supplemental Nutrition Assistance Program Participation and Costs, *available at* http://www.fns.usda.gov/pd/SNAPsummary.htm (last visited Nov. 10, 2011). Most of the illegal trafficking occurs in small stores with limited food supplies, which the USDA approves "so that low-income participants in areas with few supermarkets have access to food." GOVERNMENT ACCOUNTABILITY OFFICE, SUPPLEMENTAL NUTRITION ASSISTANCE PROGRAM: PAYMENT ERRORS AND TRAFFICKING HAVE DECLINED, BUT CHALLENGES REMAIN 11, 13 (2010), *available at* http://www.gao.gov/new.items/d10956t.pdf (last visited Nov. 10, 2011). Perhaps because of the relatively low volume of

(continued...)

In the alternative Hussein contends that the 4-level upward adjustment should not apply because he did not exercise control over at least four participants during the scheme. But a leader or organizer under § 3B1.1 need control only one participant, not four. § 3B1.1 cmt. n.2; *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005). Hussein exercised control over Fleming—the district court adopted the probation officer's finding that Hussein recruited Fleming to participate in the scheme and paid him to falsely claim ownership of Route 69—and that level of supervision was sufficient for the adjustment to apply.

---

[3] (...continued)

goods sold in these stores, or perhaps because of a lack of inspectors, the agency inspects smaller stores only about once every five years unless there is some indication of a problem. *See id.* at 13. While it is repugnant that people like Hussein have exploited this vulnerable system over the years, as distressing is the fact that, for every Hussein who operates such a scheme, there may be hundreds of beneficiaries (LINK cardholders) who commit their own criminal act by exchanging their food-stamp benefits for quick cash. *See* 7 U.S.C. § 2024(b). We can only hope that with the very large expansion of this program there is a similar expansion of enforcement personnel to intercept the many millions of dollars lost in cash-for-discounted-benefits schemes. And we would hope that there is a strict warning to all who receive this generous entitlement that any abuse similar to this cash-sale scheme will cause the immediate curtailment of their LINK benefits.

Hussein last asserts that his overall prison sentence is unreasonable. In his view, the district court unfairly penalized him for selling junk food instead of nutritious items and was unduly harsh because of concern that some of his patrons exchanged benefits for cash to buy drugs. He also adds that the court ignored his arguments in mitigation.

Hussein's within-range sentence is presumed reasonable, *Rita v. United States*, 551 U.S. 338, 341 (2007); *United States v. Meschino*, 643 F.3d 1025, 1030 (7th Cir. 2011), and he bears the burden of rebutting that presumption, *United States v. Noel*, 581 F.3d 490, 500 (7th Cir. 2009). Among the reasons that influenced the choice of sentence, the district court cited Hussein's abuse of a taxpayer-funded program, his continuation of the fraud after he knew he was under investigation, the length of the scheme, and the number of fraudulent exchanges involved. The court also noted Hussein's intelligence and his opportunities as a businessman and property owner.

The sentencing court did, as Hussein asserts, criticize him for operating stores "where people were provided essentially nothing but calories." But this criticism must be read in context. *See United States v. Nance*, 611 F.3d 409, 417 (7th Cir. 2010); *United States v. Hoke*, 569 F.3d 718, 722 (7th Cir. 2009). The court's concern was not simply the food selection at Hussein's establishments but the fact that he wasted an opportunity, handed to him by the government, to serve the needs of a community with a real shortage of grocery options. As we have noted, and as the district judge recognized, Hussein and Bazian operated businesses

that were food stores in name only. A sentencing court may consider the harm that society or a particular community suffers from a crime. *See United States v. Collins*, 640 F.3d 265, 270 (7th Cir. 2011) (affirming sentence based partly on harm to society caused by identity theft and misuse of Social Security numbers); *United States v. Brock*, 433 F.3d 931, 935, 938 (7th Cir. 2006) (affirming sentence based partly on defendant's damage to his community by possessing drugs and guns). That is all the court did here. As for the judge's comments about drug use, she never embraced the government's speculation about how Hussein's clients spent their ill-gotten cash and only clarified her understanding of the prosecutor's remarks. And regarding Hussein's arguments in mitigation, the judge acknowledged Hussein's medical condition and was not required to discuss his commonplace contentions about family circumstances, *see United States v. Gary*, 613 F.3d 706, 710 (7th Cir. 2010); *United States v. Tahzib*, 513 F.3d 692, 695 (7th Cir. 2008), and lack of criminal history, *see United States v. White*, 582 F.3d 787, 798 (7th Cir. 2009); *United States v. Martinez*, 520 F.3d 749, 753 (7th Cir. 2008). Hussein has not rebutted the presumption that his within-guidelines sentence is reasonable.

AFFIRMED.