NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 14, 2012
Decided December 13, 2012

**Before**

DANIEL A. MANION, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

JOHN DANIEL TINDER, *Circuit Judge*

No. 12-1612

| | |
|---|---|
| UNITED STATES OF AMERICA, | Appeal from the United States District |
| *Plaintiff-Appellee*, | Court for the Northern District of Illinois, |
| | Eastern Division. |
| *v.* | |
| | No. 07 CR 654-2 |
| BASSAM ZMAILI, | |
| *Defendant-Appellant*. | Charles R. Norgle, |
| | *Judge.* |

## O R D E R

Bassam Zmaili owned a small grocery store in Chicago where he rang up phony sales for food-stamp participants looking to exchange their benefits for discounted amounts of cash. Zmaili also helped his brother commit the same fraud at a second store and, according to the government, a third store as well. Zmaili pleaded guilty to two counts of wire fraud, 18 U.S.C. § 1343, and the district court sentenced him to a total of 51 months' imprisonment. On appeal he challenges the court's estimate of the loss caused by his crimes and its denial of a downward adjustment for acceptance of responsibility. We affirm the judgment.

The United States Department of Agriculture funds and administers the food-stamp program, though benefits are distributed by the states. *See*, *generally*, *United States v. Alhalabi*,

443 F.3d 605, 608 (7th Cir. 2006). In Illinois eligible persons receive a "Link card" allowing them to access their benefits electronically at participating stores, which possess machines that can read the cards and notify the USDA that the store is entitled to reimbursement. Zmaili owned Homan Discount Mart. He stipulated in the plea agreement that for seven years he and his brother defrauded the USDA by processing fake food-stamp transactions at his own store and "at least" also his brother's store, T & T Foods. When Zmaili applied to participate in the program as a retailer, he had signed an agreement with the USDA acknowledging that it is illegal to purchase Link benefits for cash, but he and his brother purchased them anyway, using the card machines at Homan and T & T Foods to trigger payments from the USDA for fictitious food sales.

After the district court had accepted Zmaili's guilty pleas, the government provided a written summary of the offense conduct to the probation officer working on the presentence investigation report. The government's version attributes to Zmaili not only the frauds at his own store and T & T Foods but also at a third store, Amber Food Mart. Amber's owner had operated his store from a building owned by Zmaili and reported repeated visits by the defendant and his brother (both together and individually) with stacks of Link cards to process fake food-stamp transactions using Amber's card machine. A review of Amber's bank records showed that Zmaili had received two checks totaling $18,000 from the store. The government also disclosed that it had spoken with a food-stamp recipient who had sold Link benefits at T & T Foods and had identified Zmaili as the buyer.

The government initially estimated (we have rounded up and corrected for a math error conceded by the government) that Zmaili was responsible for $2,059,900 in loss to the USDA for the fraudulent transactions at his store and his brother's store. Lacking accounting records for Homan and T & T Foods, the government relied on estimates of annual Link transactions that Zmaili and his brother had given the USDA when applying for approval to accept food-stamp benefits. During the period when the frauds occurred, the USDA reimbursed the two stores a total of $2,732,567 even though the estimates provided to the USDA suggested that the Link transactions would have amounted only to $672,666. The government therefore reasoned that the difference between those two sums—$2,059,900—was a reasonable estimate of the money obtained from the fraudulent transactions.

The government did have access to Amber's bank accounts and was able to prepare a loss estimate for the frauds at that store based on the $112,407 that Amber paid wholesalers for food-stamp eligible products. Assuming that Amber had applied a 50% markup and had sold all of the food it purchased, the government reasoned that Amber had engaged in about $168,610 in legitimate food-stamp transactions and received $939,300 in reimbursements—a $770,690 loss to the USDA. The government ascribed this

entire amount to Zmaili, which brought the total estimated loss for the three stores to $2,830,590.

The probation officer recommended that the district court adopt the government's loss estimate. Because that figure exceeded $2.5 million, the probation officer added 18 levels to the base offense level of 6. *See* U.S.S.G. § 2B1.1(a)(2), (b)(1)(J). The probation officer also recommended that Zmaili receive a 2-level reduction for acceptance of responsibility, *see* U.S.S.G § 3E1.1(a), and anticipated that the government would move to award him a third point, *see id*. § 3E1.1(b). Based on these recommendations, the probation officer calculated a guidelines imprisonment range of 37 to 46 months based on a total offense level of 21 and a criminal-history category of I.

Zmaili filed an objection contending that the government had overestimated the loss for which he bore responsibility. In his written submission, defense counsel asserted that the estimate of annual sales Zmaili had given the USDA for Homan was no more than a "blind prediction" and recounted that Zmaili knew from running the store that Homan actually had engaged in twice as many legitimate food-stamp transactions as expected. But counsel did not supply any evidence, not even an affidavit from Zmaili, to back up these representations. Counsel did submit a report written by a USDA agent after a site visit, which notes that Homan appeared to be a "busy and popular neighborhood grocery." Zmaili cited this report as evidence that some of Homan's food sales were legitimate.

In his written objection, counsel also noted Zmaili's insistence that T & T Foods had outperformed its annual sales estimate, though counsel did not explain how Zmaili knew this. Counsel further argued that most of the actual loss caused by the frauds at T & T Foods was not foreseeable to Zmaili because, while he did know enough about the frauds to be guilty of wire fraud, his role was "essentially" to cash the checks he and his brother received from T & T Foods as payment for their role in the frauds. Counsel asserted that Zmaili had cashed $219,782 in checks, and argued that any fraud loss at T & T Foods above that amount was not foreseeable to Zmaili. Counsel added that, although the total number of checks from T & T Foods endorsed in Zmaili's name exceeds that amount, a "basic handwriting comparison" would show that someone else had cashed many of those checks by forging Zmaili's signature. Once again, however, counsel offered no evidence to substantiate these representations. Nor did counsel address the fact that a government informant claimed to have sold her Link benefits to Zmaili at T & T Foods.

Through his lawyer, Zmaili also denied any responsibility for the frauds at Amber, but he did not address the information about him and his brother that the store owner had provided to the government. In sum, defense counsel maintained that Zmaili was responsible only for $619,932 in loss and that, as a consequence, the imprisonment range

should be just 24 to 30 months based on a total offense level of 17, *see* U.S.S.G. § 2B1.1(b)(1)(H).

The government soon filed its own objection to the presentence report, arguing that the proposed decrease for acceptance of responsibility no longer was appropriate because Zmaili was trying to minimize his responsibility for the frauds at T & T Foods and Amber. The government added that it would not be moving for a third point under § 3E1.1(b). The government also reaffirmed the loss calculations provided to the probation officer, which prompted Zmaili's lawyer to reply with written representations which, for the first time, attempted to quantify the amount of money T & T Foods had spent on purchasing inventory during the time some of the frauds occurred. The prosecutor did evaluate this new submission but concluded that the amounts represented were overinclusive: T & T Foods' inventory included items that could not be purchased with Link benefits and the asserted increase in expenditures for inventory pointed to an overstatement in its loss estimate of roughly $176,934—not enough to bring the total loss below the $2.5 million that triggers an 18-level increase. *See* U.S.S.G. § 2B1.1(b)(1)(J). Once again, then, the government stood by its estimate of $2,830,590.

At sentencing Zmaili's lawyer repeated his objections to the government's loss calculations. He also contested the government's objection to a decrease for acceptance of responsibility, insisting that Zmaili had entered a timely guilty plea and that he still accepted responsibility for the frauds at Homan and T & T Foods despite his denial of responsibility for those at Amber. Counsel observed that, even if the government did possess evidence that Amber had written two checks to Zmaili, the record still lacked evidence that he had cashed them. Counsel observed that the government had searched the residence of Hassem Fareez, another participant in the scam, and discovered a copy of Zmaili's driver's license as well as a piece of paper bearing several iterations of Zmaili's signature. From this, counsel speculated that Fareez had been the one who cashed the checks from Amber by forging Zmaili's signature. Zmaili did not testify at the sentencing hearing, and, as before, his lawyer offered no evidence to back up his representations.

After hearing these arguments, the district court stated that it had read the submissions from the government and Zmaili's counsel and asked Zmaili if he would like to speak personally on the issue of his responsibility. Zmaili stated under oath that he accepted responsibility for the frauds at Homan and his role in cashing checks representing the proceeds of the fraudulent transactions at T & T Foods. He said nothing regarding either the fraud at Amber or whether the full scope of the fraud at T & T Foods was foreseeable to him.

After Zmaili finished, the district court concluded that Zmaili had sought to minimize his role in the frauds at T & T Foods and Amber and consequently should not receive a reduction for acceptance of responsibility. The court asked the prosecutor, Madeleine Murphy, what effect this decision would have on the imprisonment range, which led to the following exchange between the court, Murphy, and Zmaili's attorney, Michael Clancy:

> MS. MURPHY: Judge, if the Court accepts the government's loss calculations for each of the three stores resulting in an amount of loss of $2.83 million, then his total offense level is 24, and the range of imprisonment is 51 to 63 months.

> THE COURT: Now, that is in disagreement, to a certain extent, with the calculation by the probation department, which has a total offense level of 21, and a Sentencing Guideline range of 37 to 46 months.

> MS. MURPHY: That's taking into account, I believe, the three points for acceptance.

> THE COURT: All right. With which the government disagrees, and the Court has now agreed with the government.

> And so, Mr. Clancy, if you have any further comments regarding the appropriate Sentencing Guideline range, you may proceed.

> MR. CLANCY: I don't judge.

> THE COURT: All right. The Court determines then the Guideline range is 51 to 63 months.

The court imposed a 51-month sentence and ordered Zmaili to pay $2,830,589.50 in restitution.

On appeal, Zmaili first argues that the district court failed to adequately explain its reasons for adopting the government's loss estimate. But while it is true that a court must resolve disputed factual issues before imposing a sentence, *see* FED. R. CRIM. P. 32(i)(3)(B), Zmaili did not present any real dispute for the court to resolve, *see United States v. Panice*, 598 F.3d 426, 440 (7th Cir. 2010); *United States v. Sensmeier*, 361 F.3d 982, 989 (7th Cir. 2004) ("[W]hile we acknowledge that the burden is on the government to prove loss, the defendants' wholly unsubstantiated statements are not enough to undermine, nor even question, the court's acceptance of the government's proof of loss."). Zmaili failed to introduce any evidence that calls the government's loss estimate into doubt. His lawyer's representations concerning the unexpectedly high food-stamp transactions at Homan and T & T Foods, about Zmaili's ignorance of the full scope of the fraud at T & T Foods, and

about Zmaili's innocence concerning the fraud at Amber are not evidence. *See United States v. Chapman*, 694 F.3d 908, 914 (7th Cir. 2012); *United States v. Diaz*, 533 F.3d 574, 578 (7th Cir. 2008). Neither the USDA inspector's report nor Zmaili's allocution contradict the government's version of events.

Zmaili also argues that the district court had an obligation to make an explicit finding regarding the scope of his relevant conduct. But a judge need not make an express finding "where it is clear from the record that the district court considered and adopted the facts recited in the presentence report, as well as the government's reasoning concerning the significance of those facts in establishing the defendant's responsibility for uncharged conduct." *United States v. Acosta*, 85 F.3d 275, 280 (7th Cir. 1996); *see United States v. Wilson*, 502 F.3d 718, 723 (7th Cir. 2007). The sentencing judge clearly adopted the government's calculation—he established a guidelines range consistent with the government's loss estimate and imposed a restitution award matching that estimate to the penny.

Zmaili cites *United States v. Leiskunas*, 656 F.3d 732 (7th Cir. 2011), as his source for a formalistic rule that judges must always explain their decision to adopt a contested presentence investigation report even where the defendant fails to present contradictory evidence and relies on his counsel's representations. *Id.* at 736, 738. Zmaili reads too much into *Leiskunas*, which relies on cases describing a district court's responsibility to explain its discretionary choice of *a particular sentence* and overlooks *Acosta* and other decisions outlining a judge's responsibility to explain guidelines calculations. *Leiskunas*, 656 F.3d at 738 (citing *United States v. Garcia-Oliveros*, 639 F.3d 380, 381 (7th Cir. 2011); *United States v. Marion*, 590 F.3d 475, 477 (7th Cir. 2009); *United States v. Villegas-Miranda*, 579 F.3d 798, 801 (7th Cir. 2009)). These are two different kinds of decisions; it is much harder for an appellate court to piece together a judge's reasoning when reviewing a sentence, which can be the result of an infinite number of combinations of the factors listed in 18 U.S.C. § 3553(a), than when reconstructing the reasoning behind a guidelines calculation, which is a significantly more straitjacketed decision.

Further, in *Leiskunas* we worried that a judge's guidelines calculation could escape review if left unexplained, 656 F.3d at 738, but we have no such concern here. Zmaili concedes that the district judge "apparently" adopted the government's reasoning to support the guidelines calculation, and he was free to bring a substantive challenge to that reasoning on appeal. He chose not to do so in his opening brief, presumably because this court has previously endorsed the methods the government used to calculate the USDA's losses, *see United States v. Hussein*, 664 F.3d 155, 160 (7th Cir. 2011) (endorsing method used for Homan and T & T Foods); *United States v. Ali*, 619 F.3d 713, 721 (7th Cir. 2010) (endorsing method used for Amber), and because he failed to introduce contradictory evidence at sentencing and cannot do so now on appeal, *see Hart v. Sheahan*, 396 F.3d 887,

894 (7th Cir. 2005). (The substantive challenge he raises for the first time in his reply brief is waived. *See United States v. Dabney*, 498 F.3d 455, 460 (7th Cir. 2007).)

Zmaili also argues that his challenge to the government's loss estimate was in good faith, and thus the district court should not have treated the challenge as a sign that he did not accept full responsibility for his crime and its relevant conduct. Because the sentencing judge is in the best position to assess a defendant's contrition, we give great deference to a denial of a § 3E1.1 adjustment. *United States v. Gordon*, 495 F.3d 427, 431 (7th Cir. 2007); *United States v. Hicks*, 368 F.3d 801, 808 (7th Cir. 2004). Although it is inappropriate for a judge to deny the adjustment where a defendant makes a good-faith challenge to a guidelines calculation, it is appropriate when the defendant falsely denies or frivolously contests his relevant conduct, and we also defer to the judge's determination that a challenge is false or frivolous. *United States v. Etchin*, 614 F.3d 726, 740 (7th Cir. 2010); *Gordon*, 495 F.3d at 431.

The sentencing transcript does not reveal whether the adjustment was denied because of frivolousness or because of falsehood, but either conclusion is supported by the record. It was frivolous for Zmaili to argue that the district court should reject the government's calculations in favor of his unsworn and uncorroborated estimate of the number of legitimate food-benefit transactions at Homan or because of his unsupported allegations of forgery. And the court was free to conclude that Zmaili's denial of responsibility for the fraud at Amber was false, given the checks that Amber had signed over to Zmaili and the uncontested account of Amber's owner. *See United States v. Lister*, 432 F.3d 754, 760 (7th Cir. 2005) (noting that § 3E1.1 adjustment can be denied where statements of defendant's counsel seek to minimize his responsibility). Similarly, the court was free to conclude that Zmaili had falsely minimized his involvement in the frauds at T & T Foods after he failed to offer any challenge to the informant who accused him of purchasing a Link card from her while working at T & T Foods.

AFFIRMED.