In the

# United States Court of Appeals
## For the Seventh Circuit

No. 18-2169

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

ISHAIHU HARMELECH,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 15-CR-724 — **Elaine E. Bucklo**, *Judge*.

ARGUED NOVEMBER 28, 2018 — DECIDED JUNE 24, 2019

Before ROVNER, HAMILTON, and BRENNAN, *Circuit Judges*.

BRENNAN, *Circuit Judge*. A federal grand jury indicted Ishaihu Harmelech on two counts of mail fraud under 18 U.S.C. § 1341. Harmelech pleaded guilty to the first count, and the government dismissed the remaining count. In pleading guilty, Harmelech, who owned and operated multiple cable installation companies, admitted to setting up hundreds of DIRECTV accounts under a fraudulent scheme and pocketing the money that should have been paid for servicing those

accounts. He now appeals his sentence, arguing the district court erred in calculating DIRECTV's losses and in applying a four-level sentencing enhancement pursuant to Sentencing Guideline § 3B1.1(a). Because we see no error in the district court's loss calculation and sentencing determination, we affirm.

## I. The Scheme

Between 2005 and 2011, Harmelech owned and operated three companies that installed cable television services at single-family residences and in multi-dwelling unit properties, such as hospitals, nursing homes, motels, senior living facilities, and apartment buildings. Harmelech managed nine different employees across his three companies, and he was responsible for the day-to-day operations. He continuously held himself out as an authorized dealer and distributor of cable installation services, despite his authorization having lapsed in 2005. As an "authorized" dealer, Harmelech contracted directly with cable providers—including DIRECTV—to install receivers in over 150 multi-dwelling unit properties.

Unlike single-family residences, multi-dwelling units typically have one master antenna system with multiple cable receivers placed in a rack called a "headend." Each receiver in the headend is tuned to one channel, and the signal is then distributed throughout the building. Each television set in the building may access multiple channels through the headend. For multi-dwelling unit buildings, it is usually the building owner or manager (rather than individual unit residents) who contracts with a cable provider for the entire building's service. A multi-dwelling receiver is generally more expensive than the same receiver installed in a single-family residence because it provides service to the entire building.

DIRECTV provides satellite television programming to single-family and multi-dwelling customers by installing a satellite receiver on the customer's property and charging a subscription fee. Each receiver bears a unique identification code, which helps tie that receiver to an individual account. The cost of a subscription depends on the type of account (single-family or multi-dwelling) and the channels provided. As is standard industry practice, DIRECTV charges more for multi-dwelling subscriptions than for single-family subscriptions. This rate structure reflects the different installation and service requirements for multi-dwelling unit buildings described above.

Authorized dealers and distributors routinely contract with DIRECTV to install receivers in multi-dwelling unit buildings. Despite lacking authorization, Harmelech installed DIRECTV receivers and exploited the multi-dwelling receiver configuration to commit fraud. Harmelech misrepresented his authority to customers to gain their trust and access their personal information to set up fraudulent accounts, as well as used fictitious names, to open approximately 384 single-family residential accounts. Once a fraudulent single-family account was created, he would place the receiver meant for that account into the headend at a multi-dwelling building, tuning the receiver to a channel not already included in the building's subscription—usually a premium channel with a higher price. Harmelech would then charge the building customer for the fraudulently-installed channel as part of a multi-dwelling subscription. The building customer would pay Harmelech directly for all channels installed under a multi-dwelling subscription, despite being billed by DIRECTV (through Harmelech) at a single-family rate. Harmelech would then pay DIRECTV the lower-billed rate, pocketing the

difference between what was charged and what the building customer paid. Ultimately, Harmelech's scheme caused DIRECTV to provide multi-dwelling buildings with channels for which neither Harmelech nor the customers were paying.

This scheme continued for over six years and involved several other participants who acted at Harmelech's direction. For instance, Harmelech's secretary assisted him in opening fraudulent accounts and used her personal credit card to make payments for those accounts on Harmelech's behalf. Another employee aware of the fraud also opened fraudulent accounts for Harmelech and installed single-family receivers in multi-dwelling buildings under Harmelech's control. Harmelech also directed the activities of seven other employees and convinced four separate companies that *were* authorized DIRECTV dealers to provide additional receivers to increase the number of fraudulent accounts he could open.

In August 2009, suspecting Harmelech was committing fraud, DIRECTV opened an internal investigation, and hired an outside firm, Signal Audit, to assist. As part of the investigation, DIRECTV and Signal Audit attempted to locate and access the headend at each multi-dwelling building that Harmelech serviced. Once inside a building, investigators inspected each receiver in the headend to determine which type of account (single-family or multi-dwelling) was associated with the unique identification code on the receiver. This allowed investigators to determine whether receivers tied to single-family accounts were being used to provide programming for the entire building.

DIRECTV and Signal Audit were able to inspect five multi-dwelling buildings in the Chicago area. For those five buildings, investigators identified the account type tied to each

receiver in the headends and found the receivers did not correspond to the buildings' DIRECTV accounts. Investigators also obtained from each building manager a list of the channels the building's residents received. The investigation produced no evidence that residents were aware of any fraud occurring on their accounts.

Once Harmelech learned of the investigation, he instructed the building managers to not cooperate and directed his employees to remove receivers from the remaining buildings he serviced before they could be inspected. Harmelech eventually stopped making payments to DIRECTV on behalf of all buildings with fraudulent accounts, causing hundreds of accounts to become delinquent. Within three to four months, DIRECTV terminated programming for all accounts serviced by Harmelech.

Although Harmelech prevented DIRECTV from inspecting all impacted buildings, the five buildings it did inspect were used to determine the quantifiable value of its losses. At sentencing, a DIRECTV representative testified its investigators compared the large numbers of channels the five building managers reported that residents actually received with the smaller numbers of channels for which DIRECTV received subscription payments. This comparison showed DIRECTV should have been paid $2,006 per building per month for the full programming provided. In its internal calculations, DIRECTV credited Harmelech for all monthly payments made on behalf of the five buildings, resulting in a loss to DIRECTV of approximately $1,477 per month per building. Altogether, DIRECTV's investigation revealed an average annual loss in programming costs of approximately $20,000 for each of the five buildings.

## II. District Court Proceedings

Harmelech pleaded guilty to defrauding DIRECTV and, in his plea declaration, acknowledged the charge of mail fraud carries a maximum sentence of 20 years' imprisonment. Harmelech also agreed to pay "any other penalties or restitution" imposed by the judge, but he did not stipulate to a restitution amount.

At sentencing, the court and the parties discussed how to calculate DIRECTV's losses. Harmelech argued he should be credited with all payments made, and he should not owe any restitution because he brought customers to DIRECTV. Although he admitted DIRECTV was not paid what it should have been because of his fraudulent scheme, Harmelech claimed his scheme benefited the company, and any losses suffered were a result of additional business he brought. Instead of proposing a calculation method, Harmelech argued DIRECTV suffered zero losses.

The government, in contrast, proposed two different loss calculation methods. The first was an estimate of the value of the programming Harmelech's customers received, but for which DIRECTV was never paid. That required taking the average monthly cost of the stolen channels from the five inspected buildings and multiplying it by 150, the number of multi-dwelling buildings that Harmelech serviced. This calculation yielded a total loss of approximately $3,511,917 a year, or $21,071,502 for years 2005-2010. The government conceded, though, that "[w]hile the value of those stolen channels would best capture the true loss suffered by DIRECTV," the $21 million estimate was speculative because it was based on a small sample size of only the five inspected buildings.

The second loss calculation was based on actual losses from identified fraudulent accounts. Under this method, the government identified the fraudulent accounts and calculated the losses associated with those accounts based on three categories: (1) the cost of account delinquencies for fraudulent accounts that became delinquent when Harmelech stopped making payments; (2) the value of DIRECTV receivers that were not returned to DIRECTV when it terminated service on fraudulent accounts; and (3) the value of promotional credits that DIRECTV gave to fraudulent accounts that would not have otherwise qualified for such credits but for Harmelech's fraudulent scheme. This second calculation did not consider the value of the stolen channels; it focused only on account delinquencies, lost equipment, and promotional credits, making it conservative even in Harmelech's view.

The district court rejected Harmelech's position, characterizing the relevant question as whether DIRECTV was paid what it should have been for the services provided. The district court adopted the government's second, conservative loss calculation and found Harmelech owed: (1) $108,000 in account delinquencies; (2) $39,000 in unrecovered DIRECTV receivers; and (3) $29,600 in promotional customer credits. The court also assessed $166,000[1] in stolen channels for the five inspected buildings and $35,000 for the price DIRECTV

---

[1] To accurately calculate DIRECTV's known programming losses, the district court began with the $20,000 baseline estimate for annual programming costs per account. It then considered the account opening dates for each of the five buildings; the longer an account was open, the greater the programming costs. Based on the age of each account, the district court estimated the total programming loss for the audited buildings as $166,000.

paid to Signal Audit to assist in the internal investigation. In sum, the district court ordered $372,600 in restitution.[2]

After calculating DIRECTV's losses, the court considered Harmelech's sentencing range. The court assessed a four-level sentencing enhancement for Harmelech's role as the organizer and leader of an otherwise extensive fraudulent scheme. U.S.S.G. § 3B1.1(a). Combined with his category II criminal history, the sentencing range came out between 46 to 57 months. The court sentenced Harmelech to 48 months.

While Harmelech conceded he acted as the manager of the scheme, he argued he should have received only a two-level enhancement under the Guidelines because the scheme involved fewer than five participants[3] and was not otherwise extensive. U.S.S.G. § 3B1.1(c). In response, the government conceded they had identified only two employees who knew of the scheme, but that it was otherwise extensive based on several factors: (1) it spanned six years and involved 384 fraudulent accounts across 150 multi-dwelling buildings; (2) the number of people Harmelech needed to maintain the scheme—nine employees, four separate authorized dealers, DIRECTV representatives, building owners and managers, and hundreds of unknowing residents; and (3) the dishonest conduct Harmelech displayed in using unknowing

---

[2] The district court's calculation was $5,000 less than what the figures add up to, but neither party noticed or corrected the district court's mathematical error at sentencing. Because the error did not affect the court's sentencing calculation under the Guidelines, and because neither party seeks to correct the court's error on appeal, we accept the restitution amount as calculated.

[3] *See* U.S.S.G. § 3B1.1, cmt. n.1 (defining a "participant" as someone who is "criminally responsible for the commission of the offense").

participants to further his scheme, including in some cases stealing their identities.

On appeal, Harmelech pursues two principal arguments: (1) the district court erred in calculating DIRECTV's loss amount when it declined to assess zero losses; and (2) the district court erred in applying a four-level sentencing enhancement instead of a two-level enhancement.[4] For the reasons below, we reject these arguments and affirm the district court.

### III. Loss Calculation

We review the district court's loss calculation for clear error. *United States v. Rosen*, 726 F.3d 1017, 1024 (7th Cir. 2013). Clear error exists only when we are "left with the definite and firm conviction that a mistake has been made." *United States v. Vivit*, 214 F.3d 908, 914 (7th Cir. 2000). The loss calculation must be "not only inaccurate but outside the realm of permissible computations." *See United States v. Gumila*, 879 F.3d 831, 834 (7th Cir. 2018) (quoting *United States v. Littrice*, 666 F.3d 1053, 1060 (7th Cir. 2012)).

Harmelech fails to make such a showing. He does not argue the court's calculation was inaccurate or outside the realm of permissible computations; indeed, he admits that the calculation is accurate and even produces a conservative estimate of DIRECTV's losses. Rather, Harmelech objects to

---

[4] Harmelech's brief also notes his opposition to the inclusion of evidence at sentencing showing his personal finances. The district judge noted she had either not seen the relevant evidence or it had not influenced her calculations. Because neither party asserts this evidence was the reason for the district court's loss and sentencing determinations, we do not address it on appeal.

calculating *any* loss at all. He argues that all payments he made to DIRECTV on the fraudulent accounts should be "fully credited" to him—without further calculation—because "[l]oss cannot include the value of services a defendant legitimately performed for the victims of his fraud." *United States v. Swanson*, 483 F.3d 509, 513 (7th Cir. 2007).

This reasoning overlooks a critical step in analyzing loss. "Nominally legitimate payments are not offset against intended loss when they are 'intertwined with and an ingredient of [an] overall fraudulent scheme.'" *United States v. Stochel*, 901 F.3d 883, 890 (7th Cir. 2018) (quoting *United States v. Marvin*, 28 F.3d 663, 665 (7th Cir. 1994)). When reviewing a loss calculation this court does not credit payments made in furtherance of the scheme. *See Stochel*, 901 F.3d at 890 (holding that defendant should not receive a credit against loss for payments covering legitimate expenses because the payments made were "essentially the cost of perpetuating the scheme," "designed to lull his victims so he could avoid detection."). We decline to adopt Harmelech's position which would require us to skip this step in our review of the district court's loss calculation.

While Harmelech admits he made payments in furtherance of the scheme, he claims the payments were nevertheless "legitimate" because DIRECTV financially benefitted. We again reject his argument. In *United States v. Lane*, 323 F.3d 568, 585 n. 4 (7th Cir. 2003), we declined to credit "gains made by successful investors in a fraudulent investing scheme, as those gains [were] only intended to lure and defraud other investors." And in *Stochel*, 901 F.3d at 890, we refused to credit a defendant who "stole receivership funds and covered his tracks with money from other sources for the purpose of

throwing the [victims] off his scent and keeping the scam alive."

Notably, in *Stochel*, we relied on the district court's finding that the defendant was not entitled to *any* credit "for the value of the services he provided" regardless of the "substantial financial benefit" the victims gained. *Id.* Here, the district court *did* credit Harmelech for the value of the payments he made to DIRECTV over the course of the scheme (based on the figures produced by the internal investigation), but those payments were less than the full amount owed. That was, in fact, the entire structure of Harmelech's scheme: make less-than-full payments to skim money off the top without DIRECTV noticing. Harmelech now asks this court to apply an unprecedented and extraordinary remedy, beyond what we contemplated in *Stochel*. He asks the court to find not only that his payments were legitimate (as they may be credited without being legitimate), but also that they were sufficient to fully compensate DIRECTV for its losses such that no further loss calculation is required. Harmelech's request conflicts with applicable case law and fails to acknowledge the extent of the harm he caused DIRECTV.

Here, the district court calculated DIRECTV's losses by assessing whether "DIRECTV was getting paid what it should have been paid." In calculating this amount, the parties presented the court three alternative theories: (1) Harmelech's theory that DIRECTV's loss was zero; (2) the government's first proposal calculating losses for all impacted buildings by projecting costs across the board based on a sample size of five buildings; and (3) the government's second proposal adding together the concrete losses for all known fraudulent accounts.

The court chose option three, plus two other known losses: the value of the stolen channels (for just the five inspected buildings) and the cost of the internal investigation. By both parties' admissions, the court's calculation was conservative. It did not assess speculative losses, but instead focused on specific, concrete loss figures: $108,000 in account delinquencies; $39,000 in unrecovered DIRECTV receivers; $29,600 in promotional customer credits; $166,000 in stolen channels for five buildings; and $35,000 to compensate for the internal investigation costs.

Because the district court's loss calculation was concrete, specific, conservative in its results, and consistent with this court's existing precedent, we see no error in the calculation. We further conclude the calculation was neither inaccurate nor outside the realm of permissible computations—indeed, it was one of three alternative options the parties presented to the court, and each component of the court's chosen figure accounted for a known and quantifiable loss.

## IV. Organizer or Leader of "Otherwise Extensive" Scheme

Under the Sentencing Guidelines, a four-level enhancement is applied to a defendant's offense level when the defendant is an "organizer or leader" of criminal activity that "involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). If the defendant is an organizer or leader of criminal activity with fewer than five participants and the activity is not considered otherwise extensive, then a two-level enhancement applies. U.S.S.G. § 3B1.1(c). On these issues, we review the district court's factual findings for clear error and legal conclusions de novo. *See Stochel*, 901 F.3d at 888; *see also Rosen*, 726 F.3d at 1024 (reviewing defendant's role as leader or manager for clear error); *United States v.*

*Hussein*, 664 F.3d 155, 156, 162 (7th Cir. 2011) (reviewing "otherwise extensive" element for clear error); *United States v. Arojojoye*, 753 F.3d 729, 737 (7th Cir. 2014) (reviewing whether § 3B1.1 applies de novo).

Harmelech admits he directed his fraudulent scheme, but claims it was not otherwise extensive. A fraudulent scheme is "otherwise extensive" if the defendant "made a substantial portion of [his] income" from the fraud scheme, the scheme "continued in operation" for an extended period, or the scheme "used many people," including unknowing individuals "to make the profit from the scheme." *United States v. Sheikh*, 367 F.3d 683, 688-89 (7th Cir. 2004); *see also Hussein*, 664 F.3d at 161-62. If the "otherwise extensive" element is satisfied, the defendant need only have exercised actual control over one other participant for the four-level enhancement to apply. *United States v. Blaylock*, 413 F.3d 616, 621 (7th Cir. 2005); *see* U.S.S.G. § 3B1.1, cmt. n.3 ("In assessing whether an organization is 'otherwise extensive,' all persons involved during the course of the entire offense are to be considered. Thus, a fraud that involved only three participants but that used the unknowing services of many outsiders could be considered extensive.").

Harmelech concedes the scheme spanned over six years and involved hundreds of fraudulent accounts from 150 multi-dwelling buildings, often using the personally identifying information of residents without their knowledge. He personally owned the three businesses used to perpetuate the fraud and made his living operating them. He supervised nine employees, two of whom knew of the fraud and facilitated it at Harmelech's direction. He lied to four separate authorized dealers, DIRECTV representatives, and building

owners and managers to open fraudulent customer accounts, gain access to the buildings, and increase the number of receivers he could fraudulently install. His customers identified him as their sole point of contact for cable services, and they refused to work with other cable providers, or DIRECTV or Signal Audit employees. Harmelech's scheme was for his own financial benefit—and, for six years, he did benefit. Based on this evidence, we see no error in the district court's decision to find the scheme was otherwise extensive. The four-level enhancement was properly applied.

For the reasons above, we AFFIRM.